581 So.2d 133 (1991)
Dieter RIECHMANN, Appellant,
v.
STATE of Florida, Appellee.
No. 73492.
Supreme Court of Florida.
May 30, 1991.
Rehearing Denied August 28, 1991.
*135 Lee Weissenborn of the Law Offices of Lee Weissenborn, Miami, for appellant.
Robert A. Butterworth, Atty. Gen. and Ralph Barreira, Asst. Atty. Gen., Miami, for appellee.
BARKETT, Justice.
Dieter Riechmann appeals from his convictions and sentence of death for the 1987 slaying of Kersten Kischnick. We affirm.[1]
Riechmann and Kischnick, "life companions" of thirteen years, were German citizens and residents who came to Florida in early October 1987. Kischnick was shot to death in Miami Beach on October 25, while she sat in the passenger seat of an automobile that had been rented and driven by Riechmann. The state's theory at trial was that Kischnick was a prostitute, Riechmann was her pimp supported by her income, and when she decided to quit prostitution, he killed her to recover insurance proceeds. Relying on circumstantial evidence, the state sought to prove that Riechmann stood outside the passenger side of the car and fired a single fatal shot through the partially open passenger-side window, striking Kischnick above the right ear. Riechmann has consistently denied committing the crime, asserting that a stranger shot Kischnick when they stopped the car somewhere in Miami to ask for directions.
Testimony at trial established that as early as the summer of 1986 Kischnick became too sick to work and wanted to quit prostitution. In the months immediately prior to the murder Kischnick and Riechmann were not getting along, and Riechmann was often verbally abusive toward Kischnick.
After arriving in Miami from Germany, Riechmann rented an automobile with his Diner's Club card, which automatically insured the passengers for double indemnity in the event of accidental death. On the evening of October 25, Riechmann drove around the Miami area with Kischnick in the passenger seat. At some point that evening, Kischnick was shot.
The evidence at trial included a series of statements Riechmann made to police during the hours and days that immediately followed the murder.[2] Riechmann, who spoke broken English, made his first statement during the investigation at the scene on October 25. He told officers that when he stopped to ask directions from a black man, he sensed danger and suddenly heard an explosion. Realizing that the man had shot Kischnick, he accelerated the car and drove around Miami in a panic looking for help. Finally, he spotted Officer Reid and pulled over. Riechmann made subsequent statements to officers at the police station, during "drive-arounds" when attempting to help police find the location of the shooting, and on the telephone. In each pretrial statement Riechmann told virtually the same story, but he was unable to recall details of the shooting or where it took place. Riechmann also told officers that he had not fired a gun on the day of Kischnick's murder.
In his trial testimony, Riechmann gave a more detailed account.[3] Riechmann testified that he and Kischnick had been touring in their car, intending to videotape some of the Miami sights. They got lost and asked a stranger for directions. When Riechmann realized they were close to their destination, he unbuckled his seat belt, reached behind him and grabbed a video camera, apparently getting prepared to use it. He said he put the camera on Kischnick's lap and was in the process of handing her purse to her so she could tip the *136 stranger when he saw the stranger reach behind him. Feeling threatened, Riechmann said he "hit the gas pedal" and stretched out his right arm in a "protective manner," with his palm facing outward in front of him. Instantly he heard an explosion, accelerated the car, and saw Kischnick slump over. After the shooting he began looking for help, driving as many as ten to fifteen miles before he hailed Officer Reid to get assistance.
While questioning Riechmann at the scene, police "swabbed" his hands for gunpowder residue. An expert for the state, Gopinath Rao, testified that numerous particles typically found in gunpowder residue were discovered in the swab of Riechmann's hand. Based on the number and nature of the particles, Rao concluded that there is a reasonable scientific probability that Riechmann had fired a gun.[4] Rao also said he would not have expected to find the same type and number of particles on Riechmann's hands if Riechmann had merely sat in the driver's seat while somebody else fired a shot from outside the passenger-side window. An expert for the defense, Vincent P. Guinn, testified that the particles of gunpowder residue found on Riechmann's hand proved only that Riechmann was in the vicinity of a gun when it was fired  not that he actually fired a gun  and that Rao's opinion was not scientifically supported.
In Riechmann's motel room police found three handguns and forty Winchester silver-tipped, 110-grain, .38-caliber-special rounds of ammunition in a fifty-shell box. An expert firearms examiner testified that those bullets were the same type that killed Kischnick, although none of the weapons found in the room were used to murder Kischnick. The expert also testified that the bullet that killed Kischnick could have been fired from any of three makes of guns. Riechmann owned two of those three makes of weapons.
The state also presented testimony about the blood found in the car and on Riechmann's clothes. Serologist David Rhodes testified that high-velocity blood splatter[5] found on the driver-side door inside the car could not have gotten there if the driver's seat was occupied in a normal driving position when the shot was fired from outside the passenger-side window. The pattern of blood found on a blanket that had been folded in the driver's seat was consistent with high-velocity blood splatter and aspirated blood, rather than other kinds of blood stains, the serologist said.[6] Blood splatter was found on the steering wheel, but none was found on Riechmann's seat belt or on the back of the driver's seat. Additionally, Riechmann had blood stains, rather than blood splatter, on his clothing. Rhodes testified that had Riechmann been sitting in the driver's seat during the shooting, his clothes would have shown evidence of blood splatter rather than just the blood stains that were found.
Evidence seized by German authorities and brought back to the United States included numerous documents. Among them were insurance papers revealing that between approximately 1978 and 1985, Riechmann had become the beneficiary of several German insurance policies on Kischnick, totalling more than $961,000 in the event of her accidental death. Under all the policies murder was considered an accidental death. German documents also showed that on June 9, 1987, Riechmann and Kischnick filed reciprocal wills in a German court *137 designating each other as "sole heir" of their respective estates.
A fellow inmate of Riechmann, Walter Symkowski, testified that while incarcerated pending trial, Riechmann was pleased with the prospect of becoming rich from the proceeds of the insurance policies and Kischnick's will.
The jury found Riechmann guilty of first-degree murder and unlawful possession of a firearm while engaged in a criminal offense. No evidence was presented in the penalty phase, and the jury recommended death by a nine-to-three vote. The court found the murder was committed for pecuniary gain,[7] and was cold, calculated, and premeditated without any pretense of legal or moral justification.[8] Although Riechmann presented no mitigating evidence, the trial court found as a nonstatutory mitigating circumstance that people in Germany who know Riechmann told police they consider him to be a "good person." The trial court imposed the sentence of death, concluding that "[t]he aggravating circumstances far outweigh the nonstatutory mitigating circumstance."
The first issue we address is Riechmann's claim that the trial court should have suppressed his statements both because he was not apprised of his fifth amendment rights, and because the statements were coerced by improper and harassing police procedures. The fifth and fourteenth amendments of the United States Constitution protect all persons from being compelled to give testimony against themselves. Because custodial police interrogations are inherently coercive, law enforcement authorities must advise persons of their constitutional rights before subjecting them to custodial interrogations. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). However, Miranda does not apply to questioning outside a custodial situation. E.g., Beckwith v. United States, 425 U.S. 341, 346, 96 S.Ct. 1612, 1616, 48 L.Ed.2d 1 (1976). To determine whether Miranda applied in this case, the trial court had to ascertain whether, in view of all the circumstances, a reasonable person in Riechmann's position would have believed he was not free to leave when he made the statements. See, e.g., Michigan v. Chesternut, 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988); Berkemer v. McCarty, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984).
The trial court conducted a lengthy hearing on the motion to suppress. Much of the evidence was uncontradicted, but there were distinct conflicts between Riechmann's account and those of police officers. Riechmann testified that he was distraught; unable to speak English adequately enough to understand the questions; and although he had freedom of movement between the times he made the statements, he was in custody when the statements were taken. Specifically he points to an occasion when police placed him in a holding area at the police station for a period of time[9] after the shooting, just prior to making a statement to Detective Matthews. Conversely, numerous police officers testified that they considered Riechmann to be merely a material witness and he was not taken into custody until after he made the statements at issue; he remained free to walk around the crime scene perimeter during the investigation; Riechmann was not handcuffed at the scene or at any time during the investigation; police did nothing to restrict Riechmann's movements during the four-day period when the contested statements were made, evinced by the fact that without consulting with the police, Riechmann left his motel at will, rented a car, and moved to a different motel during the period in question; and Riechmann initiated some of the statements by calling the police himself. As to the occasion Riechmann was in the holding area, Detective Matthews apologized to Riechmann *138 and ordered his release immediately when he discovered that Riechmann had been placed there, apparently by mistake.
After hearing all the evidence, the trial court resolved the factual disputes in favor of the state and found that Riechmann could not have reasonably believed he was in custody when he made those statements prior to his arrest on October 29. The record supports the court's decision. There was no abuse of discretion.
We recognize that even if the interrogation were noncustodial, overbearing police conduct still could deprive an accused of the fifth amendment privilege. "When such a claim is raised, it is the duty of an appellate court, including this Court, `to examine the entire record and make an independent determination of the ultimate issue of voluntariness.'" Beckwith, 425 U.S. at 348, 96 S.Ct. at 1617 (quoting Davis v. North Carolina, 384 U.S. 737, 741-42, 86 S.Ct. 1761, 1764-65, 16 L.Ed.2d 895 (1966)). To the extent that we can judge the evidence from the record, we conclude the trial court was within its discretion to find the statements were voluntary and admissible.[10]
Next we address Riechmann's constitutional claims that the hand swab and physical evidence seized in the searches of his motel room and rental car should have been suppressed. Riechmann alleges that the hand swab was coerced, the search warrants were invalid, police acted in bad faith, and that warrant exceptions did not apply.
The only alleged contested search conducted without a warrant was the swabbing of Riechmann's hand at the scene. After reviewing all the evidence at the suppression hearing, the trial court concluded that Riechmann consented to the hand swabbing. The trial court also found that police searched Riechmann's room and rental car pursuant to validly issued search warrants, and that the subsequent seizures were proper. The record supports the trial court's conclusions. Thus, we find no error on these facts.
Riechmann also challenges the admissibility of evidence seized in Germany, arguing that his constitutional rights were violated because the searches did not comply with German or American law. In response, the state urges us to follow United States v. Verdugo-Urquidez, 494 U.S. 259, 110 S.Ct. 1056, 1066, 108 L.Ed.2d 222 (1990), which held that the fourth amendment does not apply to the search and seizure by United States agents of property owned by a nonresident alien and located in a foreign country when that nonresident alien has no voluntary attachment to the United States. Riechmann's claim is not controlled by Verdugo-Urquidez because Riechmann did have a voluntary attachment to the United States and thus had greater entitlement to fourth amendment protection, having assumed the benefits and burdens of American law when he chose to come to this country. Nonetheless, we conclude that Riechmann's fourth amendment rights were not violated. In the suppression hearing, the state showed that German authorities seized the relevant evidence pursuant to search warrants lawfully issued by a German court, and Riechmann presented no competent evidence to challenge the validity of those warrants or the seizure of evidence relevant to this case.[11] Probable cause existed to support the German searches on the facts in this record. We find no constitutional violation.
Riechmann next argues that numerous incidents of prosecutorial misconduct denied him a fair trial. The record shows that in many instances Riechmann *139 did not contemporaneously object. As to those instances when he did object, the court either properly overruled the objections, or where the objections were sustained Riechmann did not indicate that sustaining the objections was not enough to cure the error by following with appropriate motions to strike, for special instructions, or for a mistrial.[12] Thus, his claims of prosecutorial misconduct are meritless or are not preserved for appellate review. See, e.g., Holton v. State, 573 So.2d 284 (Fla. 1990). In any event, our independent review of the record persuades us that the alleged acts of misconduct, individually or collectively, did not deny Riechmann his right to a fair trial.
Likewise we reject Riechmann's claim that he was denied a fair trial due to alleged discovery violations. Riechmann alleged at trial that the state had failed to provide him with certain evidence seized by German authorities, including photographs and documents. The trial court appropriately held a hearing pursuant to Richardson v. State, 246 So.2d 771 (Fla. 1971), and determined that defense counsel was permitted to examine this evidence when German police arrived in Florida for depositions. The trial court's conclusion after the Richardson hearing, that Riechmann had access to all the documents in dispute, was supported by the evidence.
Riechmann next claims that the trial court erred in admitting evidence of four German convictions as impeachment evidence and in denying his requested instruction to the jury regarding this evidence. The convictions were: solicitation of perjury, which occurred in 1974; involuntary manslaughter and negligent bodily harm connected with a 1972 automobile accident; grand theft of an automobile stolen in 1966; and forgery, which occurred in 1973. Riechmann argues that the evidence was inadmissible under sections 90.610[13] and 90.403[14] of the Florida Statutes (1987). We find merit in one of Riechmann's claims.
A foreign conviction may be admitted for impeachment in a Florida court, pursuant to section 90.610(1), provided the accused has not shown evidence of a lack of fairness in the foreign justice system.[15]See Alvarez v. State, 467 So.2d 455, 456 (Fla. 3d DCA), review denied, 476 So.2d 675 (Fla. 1985); accord United States v. Manafzadeh, *140 592 F.2d 81, 90 (2d Cir.1979); United States v. Wilson, 556 F.2d 1177, 1178 (4th Cir.), cert. denied, 434 U.S. 986, 98 S.Ct. 614, 54 L.Ed.2d 481 (1977); United States v. Rossi, 219 F.2d 612, 616 (2d Cir.), cert. denied, 349 U.S. 938, 75 S.Ct. 782, 99 L.Ed. 1266 (1955). Riechmann's convictions of solicitation of perjury and forgery were admissible under section 90.610(1) as crimes of false statement or dishonesty. So too was the grand theft charge. See State v. Page, 449 So.2d 813 (Fla. 1984) (crimes involving theft are crimes of dishonesty under section 90.610(1)).
However, as to the conviction for involuntary manslaughter and negligent bodily harm, we find the trial court abused its discretion. Clearly the offense was not a crime involving dishonesty or a false statement. Thus, the state had to establish that it was punishable by more than one year of imprisonment under German law. The state failed to carry its burden. The record shows that Riechmann had been sentenced to eight months' probation on that charge, and defense counsel asserted that Riechmann understood the offense was a misdemeanor under German law. The state produced no evidence to establish that the offense was punishable by more than one year of imprisonment under German law. Nonetheless, the trial court ruled the conviction admissible, saying, "In this country it is a felony. We'll consider it a felony because of this country." The trial court misapplied the clear and express language of section 90.610(1), which provides that the offense must be punishable "by death or imprisonment in excess of 1 year under the law under which he was convicted." § 90.610(1), Fla. Stat. (emphasis supplied). A trial court may not draw blind analogies between foreign and Florida law.[16]
Nonetheless, after considering all the facts in this record, and specifically all of the evidence properly admitted to impeach Riechmann,[17] we conclude the trial court's abuse of discretion in admitting the manslaughter conviction was harmless beyond a reasonable doubt in accordance with the principles announced in State v. DiGuilio, 491 So.2d 1129 (Fla. 1986).
The remaining three convictions were admissible pursuant to section 90.610. We agree with Riechmann's contention that, under section 90.403, the nature and remoteness of prior convictions may create a danger of unfair prejudice substantially outweighing the probative value of the evidence. See C. Ehrhardt, Florida Evidence § 610.5, at 346-47 (1984). Section 90.403 bars prior-conviction impeachment evidence "if the probative value is substantially outweighed by the danger of unfair prejudice." Page, 449 So.2d at 816. However, applying these principles to the facts, we do not find error in the admission of Riechmann's convictions of grand theft, perjury, and forgery. Justice was best served by allowing jurors to hear that the man whose critical testimony they were scrutinizing was convicted of these crimes. Although those offenses were somewhat remote in time, the trial judge did not abuse his discretion in concluding that their probative value outweighed the danger of unfair prejudice.
In a related claim, we find no abuse of discretion in the trial court's rejection of Riechmann's proposed instruction to have the jury consider the prior convictions only as impeachment evidence and not as evidence of guilt. Riechmann's convictions of forgery and perjury were germane to the issue of Riechmann's credibility, which *141 bore directly on the ultimate issue of Riechmann's guilt or innocence.
The last issue worthy of discussion[18] is Riechmann's claim that the evidence of guilt was not legally sufficient to support the convictions. Florida law requires that when the state relies on circumstantial evidence to convict the accused, the state must prove the circumstantial evidence is consistent with the defendant's guilt and inconsistent with any reasonable hypotheses of innocence. E.g., State v. Law, 559 So.2d 187, 188 (Fla. 1989); Cox v. State, 555 So.2d 352, 353 (Fla. 1989); Jaramillo v. State, 417 So.2d 257, 257 (Fla. 1982); McArthur v. State, 351 So.2d 972, 976 n. 12 (Fla. 1977); Davis v. State, 90 So.2d 629, 631 (Fla. 1956).
We are satisfied that the state met its burden of proof in this instance. Bullets recovered from Riechmann's motel room matched the type used to kill Kischnick. Riechmann possessed two of the only three types of weapons that could have been used to kill Kischnick, showing his preference for that particular type of weapon. An expert testified that particles found on Riechmann's hands established a reasonable scientific probability that Riechmann had fired a gun. Evidence of blood splatter and stains on the car, blanket, and clothes was consistent with the state's theory of what transpired that night. Insurance policies, reciprocal wills, and other evidence established a motive. Meanwhile, the state's scientific evidence about blood and gunpowder residue was inconsistent with Riechmann's theory of defense, and the state offered considerable evidence to impeach Riechmann on the witness stand. Where there were conflicts in testimony and the theories of the case, the jury had the prerogative to resolve those conflicts in favor of the state, as it apparently did. See Law, 559 So.2d at 189 (once the state introduces substantial competent evidence inconsistent with the accused's theory of the case, it becomes the jury's duty to determine whether evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt).
There is substantial competent evidence in the record to support the convictions. Riechmann makes no claims regarding the penalty and did not present any evidence in the penalty phase. The trial court found the death penalty applicable on the basis that the murder was committed for pecuniary gain and was cold, calculated, and premeditated. The trial court found as a nonstatutory mitigating circumstance from the evidence in the guilt phase that Riechmann's friends and acquaintances told police he was a "good person." We find the evidence clearly sufficient to support the aggravating factors applied. In the absence of any other evidence of mitigation, we find no error in the trial court's conclusion that "[t]he aggravating circumstances far outweigh the nonstatutory mitigating circumstance." Accordingly, the convictions and sentence of death are affirmed.
It is so ordered.
SHAW, C.J., and OVERTON, GRIMES, KOGAN and HARDING, JJ., concur.
McDONALD, J., concurs in result only to conviction and concurs with sentence.
NOTES
[1] We have jurisdiction pursuant to article V, section 3(b)(1) of the Florida Constitution.
[2] Police did not advise Riechmann of his constitutional rights as enunciated in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), until October 29, after he made numerous statements to officers that were used against him at trial.
[3] Riechmann testified that he did not give all these details to police because he was in shock after the murder.
[4] Rao also testified that a similar test performed on Kischnick showed that she had not fired a gun.
[5] In simple terms, high-velocity blood splatter is caused when the great force of energy of a bullet strikes the blood, Rhodes said. The pattern is characterized by a splatter of blood of various size droplets including a mist-like spray. Rhodes said blood splatter caused by the impact of a bullet or aspirated blood is distinguishable from other causes of blood splatter.
[6] Riechmann explained that the blood got on the blanket earlier that summer in Germany after his dog had surgery. When he and Kischnick took the dog home from the hospital, the dog's surgical wounds bled on the blanket. He said he brought the blanket with him to Miami to use on the beach, after which he intended to discard it.
[7] § 921.141(5)(f), Fla. Stat. (1987).
[8] Id. § 921.141(5)(i).
[9] There is no question that Riechmann was placed in the holding area. Riechmann claimed that he was locked in the holding area for four hours, but police testified that he was there for no more than one hour.
[10] We also find no error in the trial court's decision not to suppress Riechmann's post-arrest statements.
[11] At the suppression hearing, Riechmann attempted to offer expert opinion testimony to establish that the German searches and seizures violated German law. After a voir dire of the witness, the trial court declined to accept the evidence as expert opinion testimony, ruling that Riechmann failed to qualify the witness as an expert in the relevant field of German criminal law. See § 90.702, Fla. Stat. (1987). We conclude that the trial court did not abuse its discretion on the facts in this record.
[12] We note as an example that the state told jurors Riechmann had been indicted by "23 grand jurors." Riechmann objected because the statement was designed to leave an improper implication of guilt in the minds of the jurors. The trial court correctly sustained the objection. See Dougan v. State, 470 So.2d 697, 701 (Fla. 1985) (an indictment is nothing more than a vehicle to charge a crime and is not evidence for a jury to consider as any proof of guilt), cert. denied, 475 U.S. 1098, 106 S.Ct. 1499, 89 L.Ed.2d 900 (1986). Once the objection was sustained, however, Riechmann did not move to strike the remark, for a special instruction, or for a mistrial.
[13] Section 90.610 of the Florida Statutes (1987) provides:

90.610 Conviction of certain crimes as impeachment. 
(1) A party may attack the credibility of any witness, including an accused, by evidence that the witness has been convicted of a crime if the crime was punishable by death or imprisonment in excess of 1 year under the law under which he was convicted, or if the crime involved dishonesty or a false statement regardless of the punishment, with the following exceptions:
(a) Evidence of any such conviction is inadmissible in a civil trial if it is so remote in time as to have no bearing on the present character of the witness.
(b) Evidence of juvenile adjudications are inadmissible under this subsection.
(2) The pendency of an appeal or the granting of a pardon relating to such crime does not render evidence of the conviction from which the appeal was taken or for which the pardon was granted inadmissible. Evidence of the pendency of the appeal is admissible.
(3) Nothing in this section affects the admissibility of evidence under s. 90.404 or s. 90.608.
[14] Section 90.403 of the Florida Statutes (1987) provides:

90.403 Exclusion on grounds of prejudice or confusion.  Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence. This section shall not be construed to mean that evidence of the existence of available third-party benefits is inadmissible.
[15] Riechmann made no suggestion that the foreign convictions were unfair.
[16] In Alvarez v. State, 467 So.2d 455, 456-57 (Fla. 3d DCA), review denied, 476 So.2d 675 (Fla. 1985), the court said in dicta that, under section 90.610(1), trial courts may determine whether or not crimes committed in foreign jurisdictions would be felonies if committed in Florida. We disapprove Alvarez to the extent it conflicts with our decision.
[17] We note that the state in cross-examination brought out other evidence to impeach Riechmann's credibility. For example, Riechmann admitted he lied in Germany about being an insurance agent; he cheated German tax authorities; he has been engaged in an oil and foreign currency business, which he knows may violate German law; and he admitted to making a "white lie" to get out of a contract to buy a car.
[18] We find no merit in Riechmann's claim that reversal is mandated "in the interest of justice" because of numerous errors.