966 So.2d 298 (2007)
Dieter RIECHMANN, Appellant,
v.
STATE of Florida, Appellee.
No. SC03-760.
Supreme Court of Florida.
April 12, 2007.
As Revised on Denial of Rehearing September 20, 2007.
*301 Terri L. Backhus and Martin J. McClain of Backhus and Izakowitz, P.A., Tampa, FL, for Appellant.
Bill McCollum, Attorney General, Tallahassee, FL, and Sandra S. Jaggard, Assistant Attorney General, Miami, FL, for Appellee.
Michael Tarre, Miami, FL, on behalf of the Federal Republic of Germany, as Amicus Curiae.
PER CURIAM.
This case is before the Court on appeal from an order denying a motion to vacate a judgment of conviction of first-degree murder and a sentence of death under Florida Rule of Criminal Procedure 3.850. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons set forth below, we affirm the trial court's denial of Riechmann's postconviction motion.

FACTUAL AND PROCEDURAL HISTORY
The facts in this case are set forth in Riechmann's direct appeal in Riechmann v. State, 581 So.2d 133 (Fla.1991) (Riechmann I), and in the subsequent appeal on his first rule 3.850 postconviction motion in State v. Riechmann, 777 So.2d 342 (Fla. 2000) (Riechmann II):
Briefly stated, the evidence established that Riechmann and Kersten Kischnick, "life companions," came to Miami, Florida from Germany in early October 1987, and Kischnick was shot to death as she sat in the passenger seat of an automobile driven by Riechmann. Riechmann was charged with her murder. At trial, the State's theory was that Kischnick was a prostitute who worked for Riechmann, and when she no longer wanted to work as a prostitute, Riechmann killed her in order to recover insurance proceeds.
Riechmann maintained that they were riding around videotaping some of Miami's sights when they got lost and asked for directions. He contended that the stranger whom they asked fired the shot that killed Kischnick. Riechmann sped away looking for help, driving several miles before he found a police officer.
At trial, an expert for the State testified that numerous particles usually found in gunpowder residue were discovered *302 on Riechmann's hand and, accordingly, there was a reasonable scientific probability that Riechmann had fired a gun. In Riechmann's hotel room, the police found three handguns and several rounds of ammunition, and an expert firearms examiner testified that the bullets were the same type as used to kill Kischnick. The examiner testified that the bullet that killed Kischnick could have been fired from any of the three makes of guns found in Riechmann's room. A serologist testified that the high-velocity blood spatter found on the driver's seat could not have gotten there if the driver's seat was occupied in a normal driving position when the shot was fired from outside the passenger-side window. Riechmann was convicted of first-degree murder.
Riechmann II, 777 So.2d at 347. At the penalty phase, Riechmann's attorney presented no mitigating evidence, and subsequently, the jury recommended the death penalty by a vote of nine to three. Id. The trial judge sentenced Riechmann to death, finding two aggravating factors: (1) the murder was committed for pecuniary gain, and (2) the murder was committed in a cold, calculated, and premeditated manner. Id. at 347 n. 1. Although Riechmann presented no mitigation, the trial judge "found as a nonstatutory mitigating circumstance that people in Germany who know Riechmann told police they consider him to be a `good person.'" Riechmann I, 581 So.2d at 137. On appeal, this Court affirmed Riechmann's conviction and sentence, id. at 141, and the United States Supreme Court denied Riechmann's petition for writ of certiorari. Riechmann v. Florida, 506 U.S. 952, 113 S.Ct. 405, 121 L.Ed.2d 331 (1992).[1]
On September 30, 1994, Riechmann filed his initial rule 3.850 motion for postconviction relief.[2] After an evidentiary hearing, *303 the trial judge vacated Riechmann's sentence and ordered a new sentencing proceeding, concluding that Riechmann received ineffective assistance of counsel at the penalty phase and that the sentencing order had been improperly written by the prosecutor instead of the judge. Id. at 348. The judge denied the remainder of the claims. Id. This Court affirmed the trial court's order in its entirety, and remanded for a new sentencing proceeding before a new trial judge and jury. Id. at 366.[3] This Court also denied Riechmann's petition for writ of habeas corpus. Id. at 364.[4]
While the appeal on the first rule 3.850 motion was pending, Riechmann filed a second postconviction motion in the circuit court. This successive 3.850 motion, the subject of the current appeal,[5] raised the following claims (paraphrased): (1) newly discovered evidence involving an alleged confession from Mark Dugen; (2) the State deliberately withheld material exculpatory evidence and knowingly used false evidence regarding State witness Walter Smykowski; (3) the conduct of law enforcement officers in this case was so outrageous that it deprived Riechmann of due process; (4) Riechmann is entitled to DNA *304 testing of the presumptive blood evidence; (5) Riechmann was denied his rights to due process and equal protection because access to the files and records pertaining to Riechmann's case had been withheld by certain state agencies; and (6) the cumulative effect of newly discovered evidence warrants a new trial.
After a Huff[6] hearing on October 19, 2001, the trial court granted an evidentiary hearing on the claims concerning the alleged confession of Mark Dugen and the State's conduct involving Walter Smykowski. After numerous delays, the evidentiary hearing was held; subsequently, counsel for each side submitted a written closing memorandum.[7] The trial court thereafter concluded that Riechmann did not exercise due diligence in pursuing his successive motion and amended claims on the merits, and the motion was therefore time-barred; further, the court held that even if the motion were not time-barred, Riechmann's claims were without merit and he was not entitled to relief. Riechmann now asserts five claims of trial court error on appeal.[8]

OFFICER VESKI'S TESTIMONY
Riechmann's first claim is that the lower court erred in refusing to allow Officer Hilliard Veski's proffered testimony at the evidentiary hearing below. This testimony concerns his inventory notes reflecting his recovery of a flashlight and a blanket from Riechmann's car and his recollection of the State's pressuring him to testify at trial in a certain fashion. At the evidentiary hearing, the State objected to Veski testifying for the defense, asserting his testimony was irrelevant to the two claims on which an evidentiary hearing had been granted. Riechmann's counsel responded that the court must consider Veski's testimony cumulatively with the claim involving Smykowski. The court sustained the State's objection and did not permit Veski to testify.[9] *305 We find no error in the trial court's ruling refusing to allow Veski's proffered testimony.
Riechmann now argues that Veski's testimony should be considered as part of his argument that the State's "outrageous conduct" in this case violated both Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and that furthermore, the trial court erred in failing to grant an evidentiary hearing on this claim. He asserts alternatively that Veski's testimony could have served as an impeachment of the prosecutor who testified on the Smykowski claim at the evidentiary hearing. As noted, the lower court did not grant an evidentiary hearing on Riechmann's claim of outrageous law enforcement conduct, and Riechmann did not advance the "impeachment" argument at the hearing.
We find no error in the trial court's denial of an evidentiary hearing on the "outrageous conduct" claim and possible Brady and Giglio violations, and we agree with the State's assertion that the claim was procedurally barred for not having been properly asserted earlier in the case. The movant in a rule 3.850 motion filed in a capital case is entitled to an evidentiary hearing unless "(1) the motion, files, and records in the case conclusively show that the [movant] is entitled to no relief, or (2) the motion or a particular claim is legally insufficient." Freeman v. State, 761 So.2d 1055, 1061 (Fla.2000); see also Fla. R.Crim. P. 3.850(d). However, when a claim is raised in a successive motion, the movant has the additional burden of demonstrating why the claim was not raised before. See Owen v. Crosby, 854 So.2d 182, 187 (Fla.2003) ("A second or successive motion for postconviction relief can be denied on the ground that it is an abuse of process if there is no reason for failing to raise the issues in the previous motion."). Because a court's decision whether to grant an evidentiary hearing on a rule 3.850 motion filed in a capital case is ultimately based on written materials before the court, its ruling is tantamount to a pure question of law, subject to de novo review. See State v. Coney, 845 So.2d 120, 137 (Fla.2003).
The State asserts that Riechmann failed to demonstrate why this "outrageous conduct" claim in relation to Veski's testimony had not been asserted in the prior 3.850 motion, citing transcripts from the trial and the first postconviction proceedings demonstrating that Riechmann's trial counsel knew early on, even before trial, about Veski's role in securing the blanket and flashlight from Riechmann's car as well as Veski's claim of being pressured by the State.
The State is correct that this current claim is procedurally barred and was properly summarily denied by the trial court. The record reflects that Veski performed an inventory of the car in which the murder occurred. Veski initially stated at a pretrial deposition that he found a flashlight with bloodstains on it in the trunk of the car during his inventory search. After this deposition, but before trial, Veski informed Riechmann's trial counsel that he had testified falsely about the flashlight during the deposition and that he had refused to testify for the State at trial because of alleged improper pressures the State placed upon him to accommodate the State's case. Despite these revelations, Riechmann's counsel did not call Veski as a defense witness at trial, and Veski never testified at the trial in any capacity.
*306 In addition, during the trial, the State placed a folded blanket recovered from the front seat of the car into evidence.[10] Riechmann's trial counsel conducted a voir dire of Detective Robert Hanlon when the State attempted to introduce the blanket. During the voir dire, Detective Hanlon stated that he saw the blanket on the driver's seat of the car when he secured the car the night of the murder and did not see it again until he submitted the blanket to William Rhodes, the State's serology expert, for serology testing eight or nine months later. Detective Hanlon stated that Veski inventoried the car two days after the murder and took the blanket out of the car and delivered it to the Miami Beach Police Property Room. Riechmann's counsel further inquired:
Q. And do you know why the records show that it was recovered from the right front seat of the car?
. . . .
A. I don't believe it is in my records, sir, I don't know.
Q. How about the records of the Miami Beach Police Department?
A. I'm not privy to that, sir, I don't know.
Q. You did not take the blanket out of the car, correct?
A. No, sir.
Q. So you don't know what happened or what was done or what was laid on that blanket from the time you saw it on the night of October 25th until you got it from the property room and gave it to Mr. Rhodes on June what?
A. June 29th, sir.
Q. Do you?
A. No, sir.
Q. All right. There were other blood stained articles in that car, weren't there?
A. Yes, sir, there was.
Q. Towels, shawls, robes, correct?
A. That's correct.
Q. Do you know whether theywell, first, do you know if this is the original container that Veski put this blanket in?
A. I don't know sir. You've got to ask Veski.
Q. Okay. So you don't know whether this has been rebagged since the time he collected it from the car and put it into the property room, is that correct?
A. No, sir.
Q. Do you know whether or not this blanket was placed in a bag, a large bag with a number of other blood stained articles?

*307 A. No, sir, I don't.
. . . .
Q. So how can you tell us under oath then, Mr. Hanlon, that this blanket is in the same condition that you saw it on the night of October 25th?
A. It looks like the same blanket that was on the seat of the car.
Q. Oh, it looks like the same blanket?
A. Yes, sir.
Q. Okay. How can you tell us that it hasit is in the same condition as when you collected it or when you saw it rather?
A. I can't tell you that, sir.
In short, the record is clear that the defense had long been aware of Veski's role in the case, including his claims of pressure from the prosecution. However, no legal justification for failing to assert this claim at an earlier time was offered to the trial court below to overcome the procedural bar for claims raised in successive postconviction motions. Accordingly, relief on this claim of "outrageous conduct" was properly summarily denied by the trial court.
Regardless of this procedural bar, we also agree with the State's assertion that Riechmann could not have established a Brady or Giglio claim even if Veski's proffered testimony is considered.

Giglio Claim
A Giglio violation is demonstrated when it is shown (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew the testimony was false; and (3) the false evidence was material. Guzman v. State, 941 So.2d 1045, 1050 (Fla.2006). Once the first two prongs are established, the false evidence is deemed material if there is any reasonable probability that it could have affected the jury's verdict. Id. Under this standard, the State has the burden to prove that the false testimony was not material by demonstrating it was harmless beyond a reasonable doubt. Id.; see also Mordenti v. State, 894 So.2d 161, 175 (Fla.2004).
The Giglio claim here fails fundamentally because it is undisputed that Veski never testified, falsely or otherwise, at trial. See Buenoano v. State, 708 So.2d 941, 948 (Fla.1998) (holding that because the witness the defendant claimed presented "misleading, inaccurate, and perjured testimony" did not testify at trial, the defendant's Giglio claim was baseless).

Brady Claim
Brady requires the State to disclose material information within its possession or control that is favorable to the defense. Mordenti, 894 So.2d at 168 (citing Guzman v. State, 868 So.2d 498, 508 (Fla.2003)). To establish a Brady violation, the defendant has the burden to show (1) that favorable evidenceeither exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced. See Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).
To establish prejudice or materiality under Brady, a defendant must demonstrate "a reasonable probability that the jury verdict would have been different had the suppressed information been used at trial." Smith v. State, 931 So.2d 790, 796 (Fla.2006) (citing Strickler v. Greene, 527 U.S. 263, 289[, 119 S.Ct. 1936, 144 L.Ed.2d 286] (1999)). "In other words, the question is whether `the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" Id. (quoting Strickler, 527 U.S. at 290[, 119 S.Ct. 1936]).
*308 Ponticelli v. State, 941 So.2d 1073, 1084-85 (Fla.2006). With regards to Brady's second prong, this Court has explained that "[t]here is no Brady violation where the information is equally accessible to the defense and the prosecution, or where the defense . . . had the information." Provenzano v. State, 616 So.2d 428, 430 (Fla. 1993) (citing Hegwood v. State, 575 So.2d 170, 172 (Fla.1991); James v. State, 453 So.2d 786, 790 (Fla.1984)). Questions of whether evidence is exculpatory or impeaching and whether the State suppressed evidence are questions of fact, and the trial court's determinations of such questions will not be disturbed if they are supported by competent, substantial evidence. Way v. State, 760 So.2d 903, 911 (Fla.2000). This Court then reviews de novo the application of the law to these facts. Lightbourne v. State, 841 So.2d 431, 437-38 (Fla.2003).
As we have already discussed, the record affirmatively demonstrates that Riechmann's counsel knew in advance of trial of Veski's role in securing evidence from the crime scene and knew of Veski's assertions that he had testified falsely during his pretrial deposition and was subjected to alleged pressure by the State. Riechmann's trial counsel testified at the initial postconviction evidentiary hearing in this case that Veski "had been pressured to testify that way but he wasn't going to do it because it wasn't true." In fact, no testimony concerning the flashlight recovered from Riechmann's car was presented at trial. In addition, during the first postconviction hearing, although Riechmann's trial counsel stated he did not recall seeing Veski's handwritten notes from his inventory search of the car, he did not dispute that those notes were found in trial counsel's file. Hence, the record affirmatively reflects defense counsel's awareness of Veski's controversial role in the case. More importantly, it is also apparent from the record that Riechmann could have called Veski to testify at trial regarding the flashlight, the location of the blanket, or the alleged pressure from the State. Moreover, since Veski did not testify at trial, it also is apparent that any "pressure" on him never resulted in any benefit to the State.[11] Finally, because all of this information was not only equally accessible but was actually known to defense counsel, any Brady claim based upon its existence must also fail.
We conclude, therefore, that the lower court did not err in excluding Veski's testimony at the limited evidentiary hearing as not being relevant to the claims being tried. We also find no error in the trial *309 court's summary denial of any Brady or Giglio claim predicated upon the State's withholding of Veski's evidence or alleged pressure placed upon him by the State.

WALTER SMYKOWSKI
Riechmann next argues that the lower court should have allowed him to perpetuate the testimony of Walter Smykowski by a deposition in Dubai, or alternatively, the court should have allowed him to introduce Smykowski's affidavit at the evidentiary hearing. He also asserts that the trial court erred in its ruling denying his Brady and Giglio claims based on the State's failure to disclose all of its pretrial contacts with Smykowski.
In his first rule 3.850 postconviction motion, Riechmann raised two claims regarding Smykowski. First, he alleged that his trial "counsel was deficient for failing to investigate evidence that would have discredited the State's jailhouse informant, Smykowski, who testified that Riechmann was elated at the prospect of becoming a millionaire from Kischnick's insurance policies." Riechmann II, 777 So.2d at 357. Another inmate had offered to testify during trial as to Smykowski's lack of credibility, but Riechmann's counsel had decided not to call this witness. Id. This Court affirmed the trial court's conclusion that Riechmann's trial counsel's decision not to call the witness was reasonable. Id. Riechmann also claimed that Smykowski testified only because prosecutors had told him that they would help him get out of his federal criminal sentence. Id. at 361. Riechmann argued that this evidence had not been disclosed and could have been used at trial to impeach Smykowski. Id.
However, at trial, Smykowski acknowledged that he was hoping that the State would write a letter to the judge who was sentencing him, and defense counsel asserted at closing argument that his testimony was motivated by his desire for such a letter. Moreover, although a letter was eventually written, the prosecutor testified at the evidentiary hearing that he had not promised to write one.
Id. at 361. This Court affirmed the trial court's findings in denying postconviction relief that there had been express testimony at trial regarding the possibility of the prosecutor writing a letter to the federal parole authorities, and hence this allegedly withheld or newly discovered evidence presented no basis for relief. Id.

Deposition of Smykowski
In the current proceedings, postconviction counsel asserted that Smykowski, while a fugitive from U.S. authorities, had given a statement to a German journalist that his trial testimony was false. Terri Backhus, Riechmann's current counsel, testified that she learned from Peter Mueller, a German journalist, that Smykowski had given an affidavit recanting his testimony from trial. Thereafter, Backhus met with Smykowski in Dubai, United Arab Emirates, in March 2002 and showed him his affidavit that she had obtained from Mueller. Smykowski told her that he had lied at Riechmann's trial and that the State told him what his testimony should be. However, Smykowski would not return to the United States to testify because there was an outstanding warrant for his arrest.
Riechmann moved to perpetuate the testimony of Smykowski by asking the trial court to accept his deposition in lieu of live testimony at the postconviction evidentiary hearing. Counsel stated that she proposed an investigative trip to Dubai, and that while there she would arrange a deposition, assuming she could locate Smykowski, and the State could appear by overseas telephone and Smykowski could testify while being videotaped and recorded. *310 The State objected to this proposal because a definite location as to Smykowski's whereabouts was not then known and, further, because Riechmann was asking the court to accept testimony that had none of the reliability and procedural safeguards set out in Florida Rule of Criminal Procedure 3.190(j) concerning depositions to perpetuate testimony. The trial court denied postconviction counsel's motion on the basis that there was no witness available at that point, but it did so without prejudice and held that if the witness was later located, it would revisit the matter.
Rule 3.190(j) states in relevant part:
(j) Motion to Take Deposition to Perpetuate Testimony.
(1) After the filing of an indictment or information on which a defendant is to be tried, the defendant or the state may apply for an order to perpetuate testimony. The application shall be verified or supported by the affidavits of credible persons that a prospective witness resides beyond the territorial jurisdiction of the court or may be unable to attend or be prevented from attending a trial or hearing, that the witness's testimony is material, and that it is necessary to take the deposition to prevent a failure of justice. The court shall order a commission to be issued to take the deposition of the witnesses to be used in the trial and that any nonprivileged designated books, papers, documents, or tangible objects be produced at the same time and place. If the application is made within 10 days before the trial date, the court may deny the application.
Fla. R.Crim. P. 3.190(j). Of course, rule 3.190(j) applies to trials, not to postconviction proceedings where discovery is limited and substantial discretion is afforded the trial court. "The decision whether to grant a motion to perpetuate testimony lies within the discretion of the trial court." Cherry v. State, 781 So.2d 1040, 1054 (Fla. 2000). Hence, we review such a decision by the trial court for abuse of discretion. Jackson v. State, 575 So.2d 181, 187 (Fla. 1991).
In the present case, Riechmann's motion was neither under oath nor accompanied by sworn affidavits. Importantly, there was no assertion as to where Smykowski was actually then residing, and the motion essentially asserts, "If counsel finds Mr. Smykowski," a deposition can be arranged. Riechmann filed his motion to perpetuate the testimony of Smykowski on January 28, 2002, and proposed that the deposition be taken sometime between February 1 and 3, 2002. The State asserts that the defense did not allow the State adequate notice to attend Smykowski's deposition even if it had occurred or could be arranged. At the hearing on the matter, counsel admitted she had no address or phone number for Smykowski and did not know if he could be found.
The State points out that any oath administered over the telephone from the United States to Dubai would not have subjected Smykowski to the penalty of perjury or otherwise have been effective in even assuring a minimum level of reliability. See Harrell v. State, 709 So.2d 1364, 1371 (Fla.1998) (stating that an oath is one of the additional safeguards of the Confrontation Clause and that "an oath is only effective if the witness can be subjected to prosecution for perjury upon making a knowingly false statement"). Further, Harrell held that it must be established that an extradition treaty exists between the witness's country and the United States. Id. Here, it is undisputed that there is no extradition treaty between the United Arab Emirates and the United States. See 18 U.S.C. § 3181 (2000). *311 Hence, these fundamental safeguards are wholly lacking here.
We agree that the circumstances presented to the trial court do not demonstrate an abuse of discretion in the court's rulings. The defense was presenting a speculative scenario to the trial court fraught with concerns of reliability. Not only would the defense attorney be traveling to a country with which the United States has no extradition treaty in an attempt to find a convicted felon and depose him with no enforceable oath, but at the time the request was ripe there was only a three-day window of opportunity, with a state attorney presumably on standby via phone in the United States.
Further, although Riechmann's counsel testified that she met with Smykowski in March 2002 (two months after Riechmann's initial motion to perpetuate testimony was denied), she waited until the end of the day on July 11, 2002, the day before the evidentiary hearing was scheduled to conclude, to renew this motion, which again was denied. Rule 3.190(j)(1) specifically states that requests to perpetuate testimony made within ten days of the evidentiary proceeding may be denied. See Fla. R.Crim. P. 3.190(j)(1) ("If the application is made within 10 days before the trial date, the court may deny the application.").
Finally, Riechmann's counsel continuously acknowledged throughout the proceedings that she could not state with any confidence where Smykowski might be at any given time. Therefore, we conclude the trial court did not abuse its discretion in finding Riechmann's motion to perpetuate Smykowski's testimony insufficient and denying the motion without prejudice so that Riechmann could renew the motion if Smykowski was actually located and the requirements of the rule could be satisfied. See Pope v. State, 569 So.2d 1241, 1246 (Fla.1990) (holding that a "party offering the deposition must show it has exercised due diligence in its search for the deponent") (citing Pope v. State, 441 So.2d 1073, 1076 (Fla.1983)). Those circumstances were never demonstrated to exist here.
We also find no error in the trial court's ruling that Smykowski's affidavit could not be introduced into evidence instead of a deposition because it is hearsay. See Randolph v. State, 853 So.2d 1051, 1062 (Fla. 2003) (finding that an affidavit cannot be admitted into evidence in a postconviction proceeding unless it falls under one of the four hearsay exceptions by which the statement of a declarant who is unavailable as a witness may be presented into evidence). Riechmann has failed to identify a proper legal predicate for admission of the affidavit.

Brady/Giglio Violations
Riechmann next argues that even without Smykowski's deposition, the trial court erred in denying his Brady and Giglio claims predicated upon the State's failure to disclose all of its contacts with Smykowski prior to trial. He argues that the State failed to disclose false testimony concerning police contact with Smykowski and Smykowski's recently discovered pretrial visit with Detectives Hanlon and Matthews to see his daughter, Smykowski's letter to the State Attorney's Office asking for assistance in caring for his daughter, and the existence of reward money allegedly promised to Smykowski for testifying.[12]
*312 Specifically, Riechmann asserted that the State failed to disclose at trial and during the first postconviction hearing that Smykowski had gone on a State-arranged visit to see his daughter and that law enforcement officers had bought fried chicken for the occasion. Riechmann also presented a letter that Smykowski had written to the prosecutor asking for help in suggesting someone who could take care of his daughter while he was imprisoned. He alleged that the State knowingly allowed misleading or false testimony to be presented without correction when Smykowski testified that he had no contact with law enforcement officers between March and July 1988.
Prosecutor Sreenan testified at the evidentiary hearing below that Smykowski had sought out the State and volunteered his testimony against Riechmann. She also asserted that she did not recall seeing any letter from Smykowski concerning his daughter before Riechmann's trial, and that while she later became aware of the letter, the State did nothing for Smykowski's daughter, and his request for assistance was something the State would not get "involved in." She also testified that if she had known about Smykowski's visit to his daughter and the officers' purchase of fried chicken, she probably would have disclosed this to the defense.
Also at the evidentiary hearing below, Detectives Robert Hanlon and Joe Matthews confirmed that they had taken Smykowski on a trip to see his daughter pursuant to his request. Detective Matthews testified that he and Hanlon had secured Smykowski's custody from jail in order to conduct further investigation on the Riechmann case and, on the way back to jail, they allowed him a brief visit with his daughter. Detective Hanlon testified that they bought fried chicken to eat and that Smykowski was grateful. John Skladnik, a friend of Smykowski's from Poland, testified that he saw Smykowski and two men walk towards the house for this visit. Deborah Schaefer, Smykowski's daughter, testified that she remembered her father coming to visit her once when she was a child. Edward Carhart, Riechmann's trial counsel, testified that he did not know of Smykowski's letter to Sreenan, and had no indication that Smykowski had visited his daughter. He said he would have used this visit as impeachment of Smykowski.
The trial court concluded first that this claim was time-barred because Riechmann did not demonstrate that he exercised due diligence in pursuing his successive motion and amended claims.[13] However, the trial *313 court held that even if the newly discovered or withheld evidence, which could have been used to impeach Smykowski, had been turned over to the defendant, the outcome of the case would not have been affected. The trial court reached this conclusion after having evaluated and weighed each claim individually and cumulatively to one another, as well as cumulatively with Riechmann's previously presented claims and the evidence presented at trial and in the 1996 and 2002 evidentiary hearings. The trial court agreed that there was evidence that Detectives Hanlon and Matthews failed to reveal their taking Smykowski to see his daughter and that the State was charged with constructive knowledge of this event. But the trial court held that this impeachment evidence would not have sufficient import to undermine confidence in the outcome of the proceedings or otherwise merit postconviction relief. The trial court also held that it could not conclude on the evidence presented that the State knowingly misled the jury in any way with Smykowski's testimony.
As explained above in relation to Veski, Brady requires the State to disclose material information within its possession or control that is favorable to the defense. To meet the materiality prong, the defendant must demonstrate a reasonable probability that had the suppressed evidence been disclosed the jury would have reached a different verdict. Strickler, 527 U.S. at 289, 119 S.Ct. 1936. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Way, 760 So.2d at 913; see also Strickler, 527 U.S. at 290, 119 S.Ct. 1936. Also as explained previously, a Giglio claim alleges that a prosecutor knowingly presented false testimony against the defendant. The false evidence is deemed material if there is any reasonable possibility that it could have affected the jury's verdict. Guzman, 941 So.2d at 1050.
On the merits, we concur with the trial court's conclusion that the impeachment evidence against Smykowski, considered cumulatively with the evidence already presented in prior proceedings, does not undermine confidence in the outcome of Riechmann's trial or otherwise demonstrate an entitlement to a new trial. The jury heard at trial that Smykowski had once pled guilty to two bad check charges, that he was concerned about his daughter's welfare because both he and his wife were in jail, that he regularly acted as an informant, that he hoped he might receive a letter favorable to him from the State, and that he had been convicted of seventeen counts of fraud. The additional evidence about Smykowski's daughter adds very little to an evaluation of Smykowski's *314 credibility. Furthermore, concerning Smykowski's State-arranged trip to see his daughter, it is difficult to ascertain if the State actually presented false testimony when Smykowski testified at trial concerning whether he had any other conversations with the authorities about the case. It is apparent from the trial record that Smykowski was having difficulty understanding questions on the stand because English was not Smykowski's first language. Whether Smykowski would have understood these questions to include the visit with his daughter is unclear.
It is true that the State is assumed to know the activities of law enforcement officers. See Guzman v. State, 868 So.2d 498, 505 (Fla.2003) (concluding that reward money a detective paid to a testifying witness was imputed on the prosecutor who tried the case). However, even if this constituted false testimony, we hold that it was not sufficiently material to merit a new trial when compared to the substantial evidence presented against Riechmann at trial by the State. The record also reflects evidence to support the trial court's finding that Riechmann did not conclusively prove the State actually had Smykowski's letter to the State before trial. Nevertheless, even accepting its nondisclosure, we find any harm to be inconsequential and insufficient to meet the prejudice prongs of either Brady or Giglio.[14]

NEWLY DISCOVERED EVIDENCE
Riechmann also asserts that the lower court erred in denying his newly discovered evidence claim based upon the testimony of allegedly newly discovered witnesses Donald Williams and Doreen Bezner.[15]
*315 At the evidentiary hearing below, Williams testified that he was unemployed, homeless, and sixty-four years old. He testified that he had heard of an incident that occurred in the alleged area of the shooting, but did not see anything firsthand. He further stated that he heard people discussing the incident at a bar, and that he observed Mark Dugen and Doreen Bezner in the area. No one from law enforcement spoke to Williams regarding the incident, and he testified that he never heard of a person named Mark Gray, Bezner's boyfriend. On cross-examination, Williams admitted he was not sure of the month or year of the incident he heard about, and he admitted to having a fifty-year drug and alcohol abuse problem.
Bezner, also homeless, testified at the evidentiary hearing that she was living with her boyfriend Mark Gray in October 1987. She stated that knew she was in Miami at this time because she "left [her] kids." Bezner further testified that she witnessed an incident off 62nd and Biscayne around dusk: "I was in a dope hole shooting in a bush and a car pulled up and my old man [Mark Gray] sold dope, so he held up his hands to stop the people and when the car pulled up two GITS [young black boys] ran up to the car and shot and the car took off." She stated that she was approximately ten to fifteen feet away, and that Mark Gray did not fire shots into the car. Bezner testified that after this incident, Mark Gray locked her in their hotel room and threatened her if she ever told anyone about the shooting, and that he had indicated to her prior to the incident that he was expecting a heroin deal to go through that night so they would have a lot of money and would not need to "work anymore." Bezner stated that she remained in the hotel for a week until she escaped because Gray had become abusive since the incident.
Bezner further testified at the hearing below that she did not notice what color the car was but that she recognized the two occupants of the car because she had seen them earlier in the day at a Denny's restaurant. In describing the occupants of the car, she stated, "The lady was blond. A lot of gold. That's all I can say about the lady." She stated that the man at Denny's had "a bleach kind of job, whatever it was," but then said he had "black hair with gray in it." At the evidentiary hearing, Bezner could not identify anyone in the courtroom as being an occupant of the car, even though Riechmann was present. However, upon being shown a magazine with a picture of Riechmann in it, she was able to identify the person in the picture as the driver of the car.
On cross-examination, Bezner stated that she had never known her boyfriend to be called Mark Dugen, but she "wasn't into his business." Concerning her crack cocaine habit, Bezner stated that she was smoking crack cocaine at the time of the incident and was constantly using crack then and now. She also admitted that she was a prostitute and Mark Gray was her pimp, and that she has been convicted of over ten felonies.
*316 Following the evidentiary hearing, the trial court agreed that the testimony of both witnesses would qualify as newly discovered evidence and, furthermore, that Riechmann could not have known of these witnesses any earlier by exercising due diligence. However, the trial court ultimately denied relief and concluded that the testimony of the witnesses, when considered in conjunction with the evidence introduced at Riechmann's first rule 3.850 postconviction hearing and the evidence introduced at trial, would probably not have produced an acquittal as required by the standard for prejudice set out in Jones v. State, 591 So.2d 911 (Fla.1991) (Jones I).
To obtain a new trial based on newly discovered evidence, a defendant must meet two requirements: First, the evidence must not have been known by the trial court, the party, or counsel at the time of trial, and it must appear that the defendant or defense counsel could not have known of it by the use of diligence. Second, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial. See Jones v. State, 709 So.2d 512, 521 (Fla. 1998) (Jones II). Newly discovered evidence satisfies the second prong of the Jones II test if it "weakens the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability." Jones II, 709 So.2d at 526 (quoting Jones v. State, 678 So.2d 309, 315 (Fla.1996)). If the defendant is seeking to vacate a sentence, the second prong requires that the newly discovered evidence would probably yield a less severe sentence. See Jones I, 591 So.2d at 915.
In determining whether the evidence compels a new trial, the trial court must "consider all newly discovered evidence which would be admissible," and must "evaluate the weight of both the newly discovered evidence and the evidence which was introduced at the trial." Id. at 916. This determination includes
whether the evidence goes to the merits of the case or whether it constitutes impeachment evidence. The trial court should also determine whether this evidence is cumulative to other evidence in the case. The trial court should further consider the materiality and relevance of the evidence and any inconsistencies in the newly discovered evidence.
Jones II, 709 So.2d at 521 (citations omitted). When the trial court rules on a newly discovered evidence claim after an evidentiary hearing, we review the trial court's findings on questions of fact, the credibility of witnesses, and the weight of the evidence for competent, substantial evidence. Melendez v. State, 718 So.2d 746, 747-48 (Fla.1998); Blanco v. State, 702 So.2d 1250, 1251 (Fla.1997). As with rulings on other postconviction claims, we review the trial court's application of the law to the facts de novo. Cf. Hendrix v. State, 908 So.2d 412, 423 (Fla.2005) (reviewing de novo the trial court's application of the law to the facts in ruling on a postconviction claim that the government withheld material evidence); Gore v. State, 846 So.2d 461, 468 (Fla.2003) (reviewing de novo the application of the law to the facts on a claim of ineffective assistance of trial counsel).
Consistent with the governing law, we conclude that the trial court's finding that the testimony of these two witnesses would probably not have produced an acquittal on retrial as required by Jones II is supported by competent, substantial evidence. Williams testified that he was not a witness to the crime; he simply heard about it at a local bar. In addition, most of his testimony consisted of hearsay that would not have been admissible at trial. Further, his testimony was *317 actually inconsistent with Riechmann's testimony at trial concerning the relevant events.[16] The trial court was also entitled to find that Williams' testimony was less than credible because of his drug addiction and his inability to recall any details regarding the year, month, or time of day of the crime. Bezner's testimony may have been slightly more relevant, but still had many inconsistencies. Also, she conceded she was high on crack cocaine at the time of the alleged incident and had been convicted of many felonies, making her credibility a substantial issue. Moreover, her testimony as to the incident was also inconsistent with Riechmann's trial testimony. Under our case law, the credibility of these two witnesses was a matter for the trial court's evaluation, and Riechmann has been unable to demonstrate any flaw in that evaluation.
Riechmann further contends that the trial court erred in failing to conduct a cumulative error analysis; however, the trial court's order states that it considered the evidence in connection with "the totality of the evidence presented both at trial and at the first postconviction hearing." Given that the trial judge properly "applied the law, and its findings are supported by competent substantial evidence, . . . this Court is precluded from substituting its judgment for that of the trial court on this matter." Melendez, 718 So.2d at 748. Given that the asserted individual errors are without merit, any claim of cumulative error is similarly without merit, and Riechmann is not entitled to relief. See Griffin, 866 So.2d at 22.
In short, because this claim rests substantially upon an evaluation of the credibility of the newly produced witnesses, we will not substitute our evaluation for that of the trial court. Therefore, we affirm the trial court's rejection of this claim as failing to meet the requirements of Jones.

MOTION TO RECUSE THE TRIAL COURT
Finally, Riechmann argues that Judge Bagley engaged in improper and prejudicial ex parte communications with the State during the postconviction proceedings and should have been disqualified. Specifically, Riechmann claims that on February 27, 2003, one of the prosecutors handling Riechmann's postconviction proceedings sent a letter to Judge Bagley and copied Riechmann's counsel. The letter stated that Judge Bagley's judicial assistant had contacted the prosecutor's secretary to obtain copies of depositions of certain evidentiary hearing witnesses. The prosecutor responded to the request by letter to Judge Bagley, declining to provide the requested material. Riechmann claims his counsel did not receive the letter until the day after Judge Bagley denied postconviction relief; thereafter, Riechmann's counsel immediately filed a "motion to get the facts" and a motion to disqualify Judge Bagley because the judge sought nonrecord evidence ex parte.
In considering a motion to disqualify, the trial court is limited to "determining the legal sufficiency of the motion itself and may not pass on the truth of the facts alleged." Rodriguez v. State, 919 So.2d 1252, 1274 (Fla.2005); Fla. R. Jud. Admin. 2.330(f). In determining legal sufficiency, the question is whether the alleged facts would "create in a reasonably prudent person a well-founded fear of not *318 receiving a fair and impartial trial." Rodriguez, 919 So.2d at 1274.
The Code of Judicial Conduct prevents judges from initiating or considering ex parte communications concerning a pending proceeding. Fla.Code Jud. Conduct, Canon 3(B)(7). In addition to this prohibition, this Court has also denounced improper ex parte communication: "[A] judge should not engage in any conversation about a pending case with only one of the parties participating in that conversation. Obviously, . . . this would not include strictly administrative matters not dealing in any way with the merits of the case." Rose v. State, 601 So.2d 1181, 1183 (Fla. 1992). Without setting forth a bright-line rule, this Court has provided insight into what may (and may not) be permissible, administrative ex parte communication. See Rodriguez, 919 So.2d at 1275 (concluding that the ex parte communication was purely administrative when the state attorney, on the public records request, informed the judge that the hearing was not a status hearing, but an evidentiary hearing); Arbelaez v. State, 775 So.2d 909, 916 (Fla.2000) (determining that the ex parte communication was purely administrative when the communications related to the time period for the State to file its 3.850 response and set dates for an evidentiary hearing and the defendant's public records hearing).
Riechmann contends that the prosecutor-judge communication demonstrates that Judge Bagley was conducting an independent investigation into the case by seeking access to depositions that had not been introduced into evidence. However, Riechmann's only support of this "theory" is his speculation that because Judge Bagley communicated about obtaining depositions, he may also have communicated about other topics. Further, it is undisputed that the State rebuffed Judge Bagley's request for the depositions, and Riechmann has not pointed to any indication in the record that Judge Bagley made any other requests for information or considered any improper information in resolving the pending claims.
We reject Riechmann's assertion that the contact here was similar to that we disapproved in Smith v. State, 708 So.2d 253, 255 (Fla.1998) (concluding that the trial court's ex parte communication was improper when the judge telephoned the state attorney to prepare the order denying 3.850 relief, called the state attorney again requesting him to make a deletion in the order, and discussed a motion to disqualify with the state attorney). We find no error in the trial court's denial of the motion to recuse. There simply is no indication in this record that the trial court had any substantive ex parte contact with the State, and the inquiry concerning the depositions, communicated by the court's judicial assistant, did not result in any improper or nonrecord material being considered by the court. Nevertheless, we again caution that trial judges should be careful to avoid ex parte contacts of any kind, even through the use of judicial assistants, that could be perceived to have been made without the knowledge of all parties.

CONCLUSION
In light of the above analysis, we affirm the trial court's denial of postconviction relief.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] Riechmann argued seven claims on direct appeal: (1) the trial court should have excluded statements taken from Riechmann because the State failed to carry its burden of showing that Riechmann knowingly, intelligently, and voluntarily waived his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and gave such statements; (2) the State was guilty of prosecutorial misconduct and thereby violated Riechmann's rights to a fair trial and due process under the United States and Florida Constitutions; (3) the trial court erred in failing to require the State to make available its discovery on a timely basis; (4) the trial court erred in failing to exclude evidence seized from Riechmann in violation of the United States and Florida Constitutions; (5) the trial court erred in admitting Riechmann's more-than-ten-year-old prior German criminal convictions and in refusing to instruct the jury that it could only consider them with reference to the matter of the credibility of Riechmann; (6) under the totality of the circumstances involved in the case, the judgment and sentence should be reversed in the interest of justice; and (7) the evidence was legally insufficient to support the guilty verdicts, judgment, and the imposition of the death penalty. See Riechmann I, 581 So.2d at 137-41. With the exception of our conclusion that the trial court abused its discretion in admitting Riechmann's conviction for involuntary manslaughter and negligent bodily harm, but committed harmless error in doing so, this Court found no error and affirmed the death sentence. Id. at 140-41.
[2] This motion, as amended, contained claims that trial counsel was ineffective for: (1) failing to conduct any independent investigation and failing to present abundant available evidence of Riechmann's innocence; (2) failing to use available experts to rebut and disprove crucial prosecution testimony erroneously and unprofessionally asserting that bloodstain and gunshot residue evidence obtained from the car proved Riechmann guilty; (3) his sudden, unilateral and patently unreasonable decision that Riechmann was to testify at trial; (4) failing to suppress illegally obtained evidence; (5) unreasonably deciding to prevent the jury from knowing about Riechmann's acquittal of a federal gun charge before his arrest on the instant murder charge; (6) failing to object to countless instances of flagrant prosecutorial misconduct; (7) refusing to comply with Riechmann's expressed desire to seat African-American jurors, failing to conduct appropriate death qualification inquiry, and seating manifestly biased jurors; (8) making unreasonable errors and omissions on cross-examination of the State's witnesses; (9) making an ineffective closing argument at the guilt phase of trial; (10) failing to bring Riechmann to speedy trial; (11) failing to investigate and present mitigating evidence, omission of which resulted directly in the jury's recommendation and the Court's imposition of the death sentence; and (12) failing to request additional counsel to assist in the trial. The remaining claims alleged: (1) newly discovered evidence entitling Riechmann to a new trial; (2) a Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), claim based on the State's withholding of material exculpatory evidence; and (3) a claim that the sentence was invalid because the trial court's findings were not written by the judge but by the prosecutor and provided to the judge ex parte.
[3] Riechmann moved twice for this Court to relinquish jurisdiction during this appeal, and this Court denied both motions. The first request involved Riechmann's claim that the State pressured crime scene officer Hilliard Veski, who did not testify at trial, to give a false statement about the location of a blanket and flashlight in the car in which the victim was murdered. Riechmann's second motion to relinquish jurisdiction asserted newly discovered evidence consisting of an alleged confession from an individual named Mark Dugen to journalist Peter Mueller that Dugen, not Riechmann, had committed the murder.
[4] In his petition for writ of habeas corpus, Riechmann raised five claims: (1) ineffective assistance of appellate counsel; (2) the trial court's abuse of discretion regarding the propriety of its rulings at trial; (3) the State's suppression of favorable evidence under Brady; (4) this Court's denial of Riechmann's equal protection rights by failure to review the entire record and by denying his request to file an oversize brief; and (5) ineffective assistance of postconviction counsel. Riechmann II, 777 So.2d at 364.
[5] After this Court issued its opinion in the first rule 3.850 appeal, the trial court determined that the second postconviction motion should be resolved before the resentencing would be conducted. After conducting an evidentiary hearing on the second postconviction motion, the trial court entered an order denying relief and scheduled the resentencing for June 16, 2003. The trial court denied a motion for rehearing on the order and denied a motion to stay the resentencing proceedings. Riechmann filed a notice in this Court appealing the trial court's order denying relief, and on April 29, 2003, he filed an emergency motion to stay proceedings in the circuit court in order to hear his appeal of the denial of rule 3.850 relief. This Court denied the State's motion to dismiss or permit the lower court to exercise concurrent jurisdiction, but granted Riechmann's emergency motion to stay proceedings in the circuit court pending disposition of this appeal.
[6] Huff v. State, 622 So.2d 982 (Fla.1993). There is no transcript available in the record provided to this Court concerning the Huff hearing or the trial court's ruling on this matter.
[7] In his memorandum, Riechmann attempted to amend his rule 3.850 motion yet again, asserting three additional claims that purportedly conformed with the evidence presented at the evidentiary hearing: (1) the State violated due process by not disclosing evidence regarding Smykowski's state-arranged visit with his daughter that was favorable to Riechmann because it provided impeachment of Smykowski's trial testimony; (2) the State knowingly allowed misleading or false testimony to be presented without correction when Smykowski testified that he had no contact with law enforcement officers between March 1988 and July 1988, before he testified in front of Riechmann's jury that he received no benefit for his testimony other than possibly a letter; and (3) newly discovered evidence of innocence in the form of an eyewitness account of the shooting of the victim.
[8] The Federal Republic of Germany filed an amicus curiae brief alleging that the State of Florida did not follow proper international protocol in the form of Letters Rogatory when obtaining evidence in Germany used against Riechmann during his trial. Despite Germany's amicus brief, which was filed nearly seventeen years after Riechmann's murder conviction, Riechmann has not raised any issue on this appeal regarding the propriety of the searches in Germany. Furthermore, it is axiomatic that amici are not permitted to raise new issues. Dade County v. Eastern Air Lines, Inc., 212 So.2d 7, 8 (Fla.1968); Michels v. Orange County Fire Rescue, 819 So.2d 158, 159-60 (Fla. 1st DCA 2002). Therefore, this issue is not properly before this Court.

Further, this Court has already twice determined, both on direct appeal and in Riechmann's first habeas proceeding, that Riechmann was not entitled to suppression of the evidence seized in Germany, and the continued litigation of this issue is procedurally barred. Riechmann II, 777 So.2d at 365-66; Riechmann I, 581 So.2d at 138.
[9] The defense proposed to have Veski testify by telephone.
[10] The crime scene photographs depict this blanket being in the driver's seat. The State's serology expert, William Rhodes, testified that specks of blood found on the blanket in that position could only have reached the blanket during the shooting if the driver's seat was unoccupied at that time. Riechmann himself, however, maintained that he had been sitting on the blanket while driving the car. In both parties' opening statements at trial, they stated the blanket was found on the driver's seat. Defense counsel also asserted:

The evidence is going to show things were pulled out of the backseat onto the front seat, stacked up on the hood of the car and then bagged in mass. So we don't know what had blood on it initially and where that blood was initially as opposed to where and what had blood on it and where it had blood on it in June of 1988, eight months later, bullets, blood spots, gunshot residue.
Officer Charles Serayder, among the first policemen at the scene of the crime, testified that the blanket was on the driver's seat when he first entered the car to check if the victim was still alive and had a pulse. Riechmann himself subsequently testified that he believed the blanket was on the driver's seat folded the way it appeared in the crime scene photographs, although he claimed that the twenty-one specks of blood on the top of the blanket facing the ceiling of the car could have come from his dog, which underwent surgery and laid on the blanket afterwards.
[11] Riechmann also asserts that a cumulative analysis of Veski's proffered testimony along with other allegations of State misconduct would demonstrate prejudice similar to that found in Mordenti, where this Court granted relief when the cumulative effect of withheld Brady material cast doubt on the State's key witness, causing the confidence in the outcome of the trial to be undermined. Mordenti, 894 So.2d at 175. However, in Mordenti, the State admitted suppressing evidence; indeed, both pieces of evidence that were evaluated cumulatively to warrant relief were individually found to constitute Brady violations. Mordenti, 894 So.2d at 173-74.

In contrast, as noted above, Veski did not testify at trial, and the defense knew of Veski's inventory notes as well as Veski allegedly testifying falsely at his deposition and being pressured by the State. This Court has held that when the individual claims are procedurally barred or without merit, a claim of cumulative error also fails. See Griffin v. State, 866 So.2d 1, 22 (Fla.2003) ("Because the alleged individual errors are without merit, the contention of cumulative error is similarly without merit, and [the defendant] is not entitled to relief on this claim."); Downs v. State, 740 So.2d 506, 509 n. 5 (Fla.1999) (examining all the defendant's claims including a Brady claim and finding none of them sufficient to warrant an evidentiary hearing; therefore, there was no cumulative error).
[12] Riechmann also relies upon evidence previously presented at the 1996 evidentiary hearing in the initial postconviction proceedings. This includes: (1) character statements from thirty-seven German witnesses the State admitted to withholding; (2) portions of Detective Trujillo's police report containing statements that were favorable to the defense which the trial court at the first postconviction proceedings found to be improperly withheld by the State but not undermining confidence in the reliability of the jury's verdict; (3) police reports from Detective Hanlon; (4) evidence involving the trial prosecutor's letter to the United States Parole Commission stating that Smykowski was instrumental in achieving Riechmann's guilty verdict and death sentence; and (5) other previously undisclosed evidence presented in 1996.

This Court held in Riechmann II that Riechmann's claim concerning the thirty-seven German witnesses was "procedurally barred because he could and should have raised it on direct appeal, since by trial's end he was aware of the statements." Riechmann II, 777 So.2d at 363. This Court rejected Riechmann's Brady claim regarding Trujillo's police reports because "there was no reasonable probability that the results of the trial would have been affected had this evidence been disclosed." Riechmann II, 777 So.2d at 362. This Court affirmed the trial court's finding "that there was no undisclosed deal between Smykowski and the State." Id. at 363. Because all these claims were found to be procedurally barred or meritless, they cannot be considered in cumulative analysis.
[13] The trial court concluded in its order denying postconviction relief that Riechmann had not exercised due diligence in pursuing his successive motion and amended claims, citing specific instances of a lack of due diligence on issues concerning Smykowski:

Specifically, a lack of due diligence is evident from the following: (1) trial counsel's testimony at the 1996 and 2002 post conviction evidentiary hearing and trial counsel's pre-trial deposition of Smykowski revealed trial counsel (Edward Carlhart) and first post conviction counsel (James Lohman) were aware of Smykowski's concern and security for his daughter; (2) the existence of the March 27, 1988 letter from Smykowski to Sreenan which could and should have been discovered before Defendant's first Rule 3.850 motion filed by postconviction counsel James Lohman in 1994; (3) first postconviction counsel's inadequate search for Smykowski; (4) second post conviction counsel's (Backhus) failure to request information from journalist Peter Mueller concerning the whereabouts of Smykowski; and (5) second post conviction counsel's delay in requesting a copy of Mueller's investigative report or tape concerning confession by Mark Dugen, as well as her failure to request from Mr. Mueller copy of raw footage of Mark Dugen's taped interview.
[14] As to the issue of reward money promised to Smykowski, Riechmann failed to produce evidence to substantiate the claim at the evidentiary hearing.
[15] At Riechmann's first postconviction proceeding, he introduced the testimony of Early Stitt and Hilton Williams. Stitt testified that he was selling crack along Biscayne Boulevard when he heard a shot. He saw several men approach a car but did not see the shooter and could not describe the color of the car. He was not sure of the year of this occurrence, admitted to having his memory refreshed by Riechmann's private investigator, acknowledged thirty-eight felony convictions and four aliases, and stated that he was under the influence of drugs the night he witnessed the incident.

Williams, who was incarcerated at the time of his testimony, testified that he was selling drugs with his girlfriend and Stitt (even though Stitt testified he was not with Williams at this time) when he saw a red car with a rental tag, but he could not remember the date. He thought the occupants of the car wanted to buy drugs. Someone yelled at the car, the car made a U-turn, and someone named Mark Dugen shot into the passenger side of the car. Williams also apparently introduced Mark Dugen to a German journalist, and stated that Dugen committed the shooting. Williams admitted having been convicted of ten felonies and that he would lie if it suited his purpose. The trial court found these individuals' testimony "to be less than credible and rife with inconsistencies with [Riechmann's] own testimony at trial." This Court affirmed the trial court's determination in Riechmann's first postconviction proceeding that Williams' testimony was "less than credible and `rife with inconsistencies' with the Defendant's own testimony at trial." Riechmann II, 777 So.2d at 360.
Williams testified at the second postconviction evidentiary hearing that the man he produced to a German journalist was not Mark Dugen but was a drug addict on the street whom he paid out of money he received from Riechmann's counsel and the German journalist. He stated that he had no personal knowledge of the crime, except that told to him by Riechmann's first postconviction counsel. He stated that the State had promised him no money, and that he had lied in his testimony in the first postconviction evidentiary hearing and arranged for others to lie. A tape was also played at the second postconviction evidentiary hearing in which he was discussing "charitable contributions to the Hilton Williams Be Free Fund" with Riechmann's current counsel. The trial court was entitled to consider this prior evidence cumulatively with Williams' current evidence in resolving the credibility and weight of the evidence presented on the newly discovered evidence claim.
Riechmann's claim on appeal regarding "Kool," an alleged drug dealer and associate of Williams who allegedly was overheard by Williams bragging about "ripping off and wasting someone," was not raised as an issue in Riechmann's second postconviction motion. In fact, it was not raised until Riechmann's written closing argument after the second evidentiary hearing. Under these circumstances, we conclude the trial court acted properly in rejecting any claim relating to "Kool" as both untimely and improperly pled.
[16] Riechmann testified at trial that he and the victim had gotten lost so they stopped and asked a lone black man for directions. The man provided the directions and Riechmann turned to the back seat of the car to get his video camera. As he turned back, the man fired the shot. Then Riechmann sped away and looked for help.